May it please the court. Good morning. My name is Robert Devereaux, and I represent the appellant, Thomas A. Connelly, in his capacity as executor of the estate of Michael Connelly, Sr. This is an estate tax refund case arising out of the services audit of appellant's estate tax return. This audit took place. It was relatively routine. There were adjustments made in favor of the estate and the service. These adjustments were insignificant, and as the service indicates on page 10 of its brief, the key dispute was whether $3 million in life insurance proceeds that Crown C. employed in purchasing Michael Connelly's shares should be included in Crown C.'s value in determining the fair market value of Michael's shares at the time of his death. Put another way, the only issue in this case is whether the proceeds of a life insurance policy acquired for the sole purpose of funding a company's purchase a descendant stockholder's shares are includable in the fair market value of the corporation for estate tax purposes. When do you do the valuation? Is the valuation at the moment of death, or is it at some time later when the operation of the agreement goes into effect? We have a situation where the buy-sell agreement provided that they were to value the company every 18 months. Unfortunately, time got in the way and running the business got in the way, and they did not do that. It's our position that it's clear that the valuation of the company should be before the attachment of the life insurance proceeds. And it is also, you know, the essence of the buy-sell agreement was to have a funding mechanism, i.e., the life insurance. What means was used to determine that the company was worth $3 million? Where did that figure come from? So, you know, one of the things in preparing for this argument that came to light that I want to point out is during the audit process, the parties addressed the valuation issue. And, you know, a lot was written regarding the exceptions in Section 2703B that allow you to maybe step away from the fair market value. But in the end, the parties, the estate and the Internal Revenue Service, entered into a stipulation as to the value of the shares at the time of the ascendant's death, which did not include the life insurance proceeds. So that was stipulated too. So the $3 million valuation was a stipulation? Well, we submitted to the service a valuation of $2,983,000. And when we got into the stipulation, the parties agreed that the value would be raised to $3.1 million. And from the estate's standpoint, the cost of retaining an expert to come up with a valuation was far greater than the additional tax that the stipulation would result in. And so we think And the $3.1 million stipulation did not include the life insurance proceeds, is that correct? Correct. So, as I indicated, the important thing about the stipulation and this Section 2703 analysis is the fact that regardless of whether or not a pellant qualified for the safe harbor under 2703B, it really became irrelevant because the parties stipulated to the value of Michael's addresses. The fact that even if the stock purchase agreement became inoperative for the company remains an enforceable liability against the company. Let's talk about that for a minute. At the moment of death, Crown C is entitled to an asset, has an asset, $3 million for life insurance proceeds, right? Yes, Your Honor. You argue that it also has a liability. And going back many, many years to undergrad, as I recall, a balance sheet is assets balanced off against liabilities and equity. Isn't the offset here to the asset a reduction in the equity of the company as opposed to a liability? Your Honor, it's our position it is not. And the reason it is not... In a traditional accounting sense, it is, isn't it? No, Your Honor, I don't believe it is because it's a factual liability. Let me finish. If you redeem the shares with the asset, you're not paying off a liability, you're redeeming shares, which changes equity. No, Your Honor, redemption has a number of different meanings. And in redemption, in the buy-sell agreement, is the requirement to purchase the shares. There are redemptions that take place all the time. In Wall Street and big publicly traded companies, redeem shares, they just buy back their shares because they think it's a good investment. And in that instance, they are reducing the equity. Right. In this instance, we have a contractual liability that the parties entered into that is enforceable. And that contractual liability was a liability on the financial statement. Now, the district court concluded that the stock agreement wasn't enforceable because it didn't meet certain criteria of enforceability. Is that? Yes, Your Honor. And that was in reference to the exceptions that allow a buy-sell agreement to be analyzed pursuant to certain exceptions. And when you look at Section 2703 in the exception, it's kind of circular because Section B of the exclusion, Section 2 of it says, you know, oh, well, it won't work if you transfer the property for less than full and adequate consideration. So it's kind of like the reverse of what's required, and that is you have to the fair market value of the shares. The court's, what was erroneous about the court's determination that what did take place here was precisely a transfer of property to members of the decedent family for less than full and adequate consideration? Well, certainly that's what the court ruled. What's the error in the court's ruling? Well, the error in the court's ruling is the fact that the court included the life insurance proceeds in valuing the company. And when you include the life insurance proceeds in valuing the company, it completely nullifies the intended effect of the buy-sell agreement. Is there any other authority out there at the circuit level other than the Blount case that has spoken on this question? Yes, Your Honor. We have the Ninth Circuit in the case of the estate of Huntsman, and we have a prior tax court case in 19, I'm sorry, excuse me. The Ninth Circuit case was the estate of Cartwright in 1999, and the prior case was a tax court case, the estate of Huntsman, which was a 1976 case. So we have 46 years of judicial holdings that stand for the proposition that life insurance proceeds that are required to be used in a buy-sell agreement are not included in the valuation of a corporation for estate tax purposes. Counsel, I want to follow up on what the chief was asking about on the agreement, because I think we have another problem aside from the lack of sort of an arm's length consideration, which is the agreement was at least modified post-death. That is to say that the $3 million was arrived at not because of the agreement itself, but because two parties agreed to it. And so isn't it necessarily not eligible for the safe harbor under that reasoning? I mean, it wasn't even, it was Michael Jr. and Thomas at the time of death agreed on the $3 million transfer. Right. So what we have is a situation, and unfortunately, you know, the parties stipulated as to the value of the $3 million. And that was an agreement that occurred post-death? Well, yes, and it's the same analysis that was undertaken with respect to the audit. I mean, what we're doing is we're trying to determine the value of the shares as it relates to the filing of the estate tax return. And I'll remind you, we had a situation where there were $3.5 million worth of life insurance proceeds, and this was not in the record. But there's a reason why the service stipulated that Michael's interest or the value of his shares was $3.1 million. And that is because at the time, Crown C was not doing very well and needed that additional $500,000 in death proceeds to prop up the company. And in fact, those proceeds, those $500,000 proceeds were included in the valuation in coming to the value of Michael's shares and in calculating the total value. You're totally answering my question. I don't dispute any of this. I'm just trying to figure out whether that makes you ineligible for the safe harbor. It has to be active. It has to be enforceable and adhere to in life and death. And here you necessarily have an agreement with post-date of death. So I don't see how there's even a colorable argument that it's subject to a safe harbor at this point. Your Honor, I'm glad that you're asking that question because what we have is a situation that the Blount case had to address this very issue. And it was a And in Blount, they did not fall within the safe harbor. And the court declared that an analysis needed to be undertaken to determine the value of the deceased shares in that case. And in that case, what they did was they accepted the tax court's reasoning regarding valuation and then proceeded to address whether or not the life insurance proceeds should be included. I'm going to stop there and have a very brief rebuttal. Thank you. All right. Thank you, Mr. Devereux. Ms. Bringer. Thank you, Your Honor. Good morning and may it please the court. My name is Nora Bringer and I represent the government at Police in this case. A hypothetical buyer of Crown C Supply at the time of Michael's death, which is the proper time to value Michael's estate, would have extracted $6.86 million in value just as brothers Michael and Thomas Connolly did. Michael's estate received $3 million and Thomas became the 100% owner of a company worth approximately $3.86 million. The $3 million price for Michael's interest in Crown was an ad hoc price that indeed was not determined under the stock agreement entered in 2001. And that $3 million undervalued Michael's interest in Crown by about $2.3 million. That meant that $2.3 million of Michael's assets of his interest in Crown got transferred in a windfall to Thomas and the estate wants that $2.3 million to sidestep the estate tax. The district court correctly rejected that position. As an initial matter, the stock agreement that Michael and Thomas signed in Indeed, the valuation the estate asked the court to accept was not even determined under the terms of that stock agreement. And that shows that the agreement right off the bat does not meet two of the requirements for it to control valuation here. That is, the agreement was not binding after Michael's death and the price was not fixed or determinable under the agreement. I'm happy to walk through the other factors the court would like for me to, or if the court has questions about any of that, I'm happy to address those questions. Okay, seeing none, I'll turn to the fair market value analysis. The district court correctly concluded that because the 2001 stock agreement did not control valuation here, it needed to move on and determine the fair market value. And the only question here, obviously, is the treatment of the life insurance proceeds. A couple of beast framework items just to put on the table. So the gross estate is broad and expansive. It includes all of Michael's property and his interest of property at the time of his death. And the fair market value under Treasury regulations is the price at which the property would change hands between a willing buyer and a willing seller. And as this court and other courts have made clear, those are hypothetical persons with reasonable knowledge of all the facts. In this case, a willing buyer, as the district court explained, would have paid $6.86 million for Crown at the time of Michael's death. The buyer would own the whole company and could either allow Michael's former shares to be redeemed and receive that money and then own a company worth the remainder, or as the owner of all of the shares, cancel the redemption obligation and leave all of the money in the company. Either way, the buyer would extract $6.86 million out of Crown just as Michael's estate and Thomas collectively did. When valuing Michael's shares, a buyer would not reduce Crown's value by the funds paid to redeem those very shares. That treats Michael's Perhaps more important, a hypothetical willing seller of Michael's interest in Crown would not have accepted $3 million for Michael's shares. Thomas and Michael together, as I've said, extracted $6.86 million from Crown, but Thomas got much more than his share. Michael owned 77% of Crown, but his estate got less than half of its value. And Thomas owned less than a quarter of Crown, but got more than half of its value. And the estate's position makes each of Thomas's shares worth more than four times each of Michael's shares. This is a situation that a hypothetical willing seller of those shares simply would never accept. Did the business record show what the actual division of shares was between the brothers? Your Honor, the division of the shares between the on where that interest division is, but it is in the record and we cite that in our brief. There's no dispute that Michael owned 77.18% and Thomas owned 22.82%. Counselor, I want to ask about the timing here. The timing is very slippery and I think that the Eleventh Circuit had a different view of the timing than perhaps your advocate, and we'll get to that in a second. One of the things that's fascinating about this case is when to really look at it. So at the time of death, I heard opposing counsel make this argument, although he didn't pursue it directly later, which is the insurance proceeds weren't yet in the company. So the value must be $3.2 million or $3.3 million or whatever it is. Or do you value it after the insurance proceeds come into the company? At which point he says, well, that still doesn't work because then they have to pay out $3 million. And so I just want to give you a chance to respond to what I think may be his fundamental argument that we just, no matter how we treat the insurance proceeds, they shouldn't count in the valuation. Well, Your Honor, at the time of Michael's death, at that moment, which is the time at which his interest and crown should be valued, the estate at the moment he, or the company at the moment he died, almost necessarily did not have the life insurance proceeds. Now, I don't believe the record reflects when the company did receive the life insurance proceeds, but it doesn't matter because at the moment of Michael's death, the company had a matured right to receive $3.5 million in life insurance proceeds. And there's absolutely no suggestion that this is a situation where it was in doubt that the company would in fact receive those proceeds. So, you know, it doesn't really make any difference in our view when the company received the proceeds. In terms of the timing, the problem with the estate's position, and I think this is the fundamental oversight in Blount, and to the extent the Ninth Circuit addressed this issue in Cartwright also with that case, the estate's approach values the company after redemption, after the money has been paid out, and after Michael's ownership share has been withdrawn from the company. What that does is it values the company that Thomas owned after the redemption. It doesn't value Michael's interest in the company, which necessarily occurred before the redemption. It doesn't make sense to assume that Crown, excuse me, paid $3 million to redeem Michael's shares, and at the same time that Michael still owned 77 percent of the company. And that's the timing issue that we really see as the fundamental mistake from the other two appellate courts that have addressed this issue. Have any appellate courts adopted your way of looking at this? No, Your Honor. Appellate courts have not adopted this specific way of looking at this, but I will note that the estate admits that under its approach, Crown was worth the same before and after the redemption. Now, that doesn't make sense. A redemption should reduce the value of a company. It represents an owner withdrawing their interest from a company. And the fact that redemptions reduce corporate assets has made courts and legislatures concerned about protecting creditors, and here's the way to get to the answer to your question. There are appellate cases looking at creditor protection issues and discussing at least the fact that redemptions do reduce the corporation's assets. We cite these cases in our brief, the Seventh Circuit in In Re Reliable Manufacturing and the First Circuit in In Re Roco Corp. And Judge Learned Hand also addressed this more than 100 years ago in one of his Southern District of New York cases that we also cite in our brief. Are there any further questions in the panel for me? Thank you very much. We ask you to affirm. Your Honors, I just have a very brief period here. The time of the death, when Michael died, that's when the liability was triggered for the corporation to have contractual liability with respect to the buy-sell agreement. This windfall issue is also a red herring. There was no windfall. The buy-sell agreement was funded with life insurance, which meant the brothers had to forego distributions to fund the premiums since 1983. And there was no windfall here. The brothers wanted the security and the certainty that their shares would be and that's what they contractually contracted for. That's what they agreed to do because that's what they wanted to do. How can there not be a windfall to Thomas when his pre-death share value is $7,700 and his post-death share value is $34,000? Your Honor, that is the result of the agreement that they made. And nobody, the estate is not contending that there's a windfall and Thomas obviously is not contending there's a windfall. The person that should be complaining about the windfall is the insurance company that paid it. But guess what? They had a contractual obligation when they issued the life insurance policy. And that is the essence of putting together a buy-sell agreement with life insurance to allow the family to continue to own the business without having to sell it if one of the shareholders dies. And the tax code has supported that by virtue of the fact that life insurance proceeds typically are not taxed. And I mean, it's kind of the example of nobody complains when somebody's wife gets $500,000 in death proceeds. Is that a windfall when, you know, maybe there was only $50,000 in premiums paid? And that's exactly what we have here. Your Honors, my time is up and I thank you for your time. Thank you, Mr. Devereux. Thank you also, Ms. Bringer. The Court appreciates both